## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GALAXY PRODUCTS & SERVICES, INC.,

       Plaintiff,

    v.

AMI ENTERTAINMENT NETWORK, INC.,

and

THOMAS F. FRICKE,

       Defendants.

Case No.  2:12-cv-06963-MAM

**CIVIL ACTION**

### SECOND AMENDED COMPLAINT

Plaintiff, Galaxy Products & Services, Inc. ("GPS"), for its Second Amended Complaint against AMI Entertainment Network and Thomas Fricke, states as follows:

### PARTIES

1.    Plaintiff GPS is an Illinois corporation with its principal place of business in Davie, Florida.

2.    Defendant AMI Entertainment Network (AMI) is a Delaware Corporation with its principal place of business in Bristol, Pennsylvania.

3.    Defendant Thomas F. Fricke ("Fricke") is an individual and a citizen, resident, and domiciliary of the State of Missouri.

- 1 -

## JURISDICTION

4. The amount in controversy in this action, exclusive of interest and costs, exceeds the sum or value of $75,000, and there exists complete diversity between all parties.

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

6. Venue is proper pursuant to 28 U.S.C. § 1391(b), because as set forth more fully herein, a substantial part of the events or omissions, and effects of the events or omissions, giving rise to the claim occurred in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

7. AMI's business activities include designing video gaming software and constructing video gaming terminals.

8. In 2009, the Illinois Video Gaming Act, making video gaming terminals legal in the State of Illinois, was passed. *See* 230 ILCS 40/1 (2009) *et seq.*

9. In 2009 and 2010, AMI sought to enter the regulated gaming market in Illinois.

10. The software design is often the most expensive and time-consuming portion of video gaming terminal design, because it forms the backbone of the gambling experience, including software design to assure that the game performs to the parameters of the gaming laws of the applicable jurisdiction, as well as to create customer likeability and performance enough to be economically competitive with other games in the relevant marketplace.

11. A video gaming terminal for use in the State of Illinois requires an interface protocol for communication with the Illinois Gaming Board ("IGB").

12. Due to Illinois' strong public policy interest in regulating its gaming industry, there are strict regulations and requirements for any corporation seeking to market and sell regulated gaming devices in the State of Illinois. *See* 230 ILCS 40/1 (2009) *et seq.*

13.     In 2010, AMI's parent company, Harbour Group, determined it would not be in the best interests of AMI to directly pursue the regulated gaming market in the State of Illinois.

## AMI, Through Fricke, Convinces GPS to Enter the Illinois Regulated Gaming Market By Licensing AMI Technology

14.     Thomas Fricke ("Fricke") was counsel for AMI in 2010.

15.     Michael Maas ("Maas") was President and CEO of AMI in 2010.

16.     In 2010, AMI, acting through its agent Fricke, sought an individual or entity to purchase video gaming terminals and license AMI properties and pursue the regulated gaming market in the State of Illinois.

17.     Fricke, as agent for AMI, approached John Bailey ("Bailey") regarding the opportunity to purchase and license AMI properties for the Illinois market and enter the Illinois regulated gaming market.

18.     Fricke stated to Bailey that AMI had already spent a substantial amount of money in software design for the Illinois regulated gaming industry, periodically saying AMI had spent "over one million dollars" on design.

19.     Fricke, as agent for AMI, began discussing with Bailey the possibility of forming a venture to enter an agreement with AMI to purchase and license AMI properties, for Illinois as well as other markets.

20.     Fricke, though still counsel for AMI, stated that he would represent Bailey and the entity now known as GPS in negotiating any agreements with AMI. [1]

21.     On May 6, 2010, Fricke solicited a conflict of interest waiver from Bailey, as agent for GPS, and Maas, as agent for AMI.

---

[1] Although GPS was not incorporated until August 2010, for ease of reference, the term GPS is used herein to refer to the entity to be formed in addition to the incorporated entity.

22.     Fricke suggested that AMI seek outside counsel to review the Conflict of Interest waiver, but did not advise Bailey to do the same.

23.     On May 7, 2010, Bailey met with Brandon Bezzant ("Bezzant"), an executive at Harbour Group, AMI's parent company, to discuss the potential ventures between GPS and AMI.

24.     At the time of the meeting between Bailey and Bezzant, neither AMI nor GPS had signed the Conflict of Interest Waiver.

25.     On May 7, 2010, in anticipation of a meeting scheduled with Maas on May 14, 2010, Fricke sent the Conflict of Interest Waiver signed by AMI to GPS and instructed Bailey to sign it and send it to Maas prior to the scheduled meeting.

26.     On information and belief, both before and after the May 14, 2010, meeting between Bailey, Fricke, and Maas where the business venture between GPS and AMI was discussed, Fricke met with AMI representatives without the presence of Bailey and discussed the business between AMI and GPS.

27.     During 2010, Bailey met in person and over the phone with representatives from AMI, during which times Maas reiterated that AMI had spent substantial amounts of money on game design and that with the help of their sister company in the United Kingdom, Games Warehouse (which had experience designing and producing video gaming terminals in the United Kingdom), only minimal modifications to existing games were needed in order for AMI and GPS to bring unique products to the Illinois regulated gaming market.

**GPS Invests Heavily in AMI's Products for the Illinois Regulated Gaming Market**

28.     In reliance upon both Maas' and Fricke's statements, Bailey met with investors and incorporated GPS in August 2010, in order to pursue the proposed particular business venture with AMI in the regulated gaming market in the State of Illinois.

29.     In early October 2010, GPS and AMI signed a Letter of Intent regarding the parties' intent to sign an agreement for the production of video gaming terminals for use in the regulated gaming market in the State of Illinois.

30.     On October 18, 2010, and October 19, 2010, GPS, through Bailey, met with representatives and agents from AMI, including Maas and the Director of Gaming of Games Warehouse, Kevin McGovern ("McGovern"), to discuss the games that GPS would bring to the Illinois regulated gaming market.

31.     At this mid-October meeting, the parties agreed to thirteen games to be designed or modified for the Illinois regulated gaming market.

32.     Under the Illinois Video Gaming Act, the IGB was to publish the relevant interface protocol for video gaming terminals through a bidding process.

33.     Companies wishing to enter the Illinois regulated gaming market were required to design video gaming terminals to prepare for the market and ultimately integrate the interface protocol with the finished video gaming terminals.

34.     Thus, AMI and GPS worked to bring the games to the Illinois regulated gaming market during 2010 and 2011.

### Fricke Acts as a Dual Agent; AMI Finally Hires Counsel

35.     From May 2010 to January 2011, despite the fact that the Conflict of Interest Waiver stated that AMI would be represented by Dickstein Shapiro in the transaction between AMI and GPS, Fricke was the only lawyer involved in any dealings between GPS and AMI.

36.     From May 2010 to October 2010, Fricke, functioning as an undisclosed dual agent, negotiated and drafted several versions of the Letter of Intent, the final version of which was signed by GPS and AMI in October 2010.

37.     In October 2010, Larry Zimmerman, GPS investor and representative, inquired of Fricke whether a conflict of interest existed. Fricke assured Zimmerman that no conflict existed.

38.     In November and December 2010, Fricke, functioning as an undisclosed dual agent, drafted and negotiated several versions of an agreement relating to production of video gaming terminals for use in the regulated gaming market in the State of Illinois ("the Illinois Agreement").

39.     The Fricke drafts of the Illinois Agreement were basically neutral in that they did not contain provisions that generally favored either GPS or AMI.

40.     In January 2011, after Fricke negotiated and drafted no less than four versions of the Illinois Agreement, Jon Grossman ("Grossman") of Dickstein Shapiro began negotiating terms on behalf of AMI.

41.     Each of the Fricke drafts of the Illinois Agreement contained an Illinois choice of law provision, the obvious choice considering that the agreement was for the production of video gaming terminals to be sold in Illinois and is to a large extent controlled by the terms of the Illinois Video Gaming Act.

42.     On information and belief, among other changes unfavorable to GPS, Grossman changed the choice of law clause to Pennsylvania and added a Pennsylvania forum selection clause.

43.     Fricke, a Pennsylvania lawyer, still working for AMI, did not object and never informed GPS of the potential effect of the choice of law and forum selection clause, particularly with reference to the fact that AMI's principal place of business is Pennsylvania.

**AMI Assures GPS that Games are Complete; Fricke Remains Silent**

44.     As early as February 2011, AMI, through Maas, stated to Bailey that several of the games were complete and "on the shelf."

45.     AMI stated that these "on the shelf" games were "completed," "done," and "finished," such that they only required integration with the interface protocol and testing by the Independent Testing Laboratory for the IGB in order to be deployed in the Illinois gaming market.

46.     Fricke was aware of AMI's statements to Bailey that several of the games were "on the shelf" and "completed," "done," and "finished," and was further aware that such statements were inaccurate.

47.     In reliance upon AMI's statements that game design was progressing and that as many as six games were complete, GPS invested substantial time, money, and efforts in the advertisement, promotion, and development of the market for the new video game terminals which GPS could bring to the regulated gaming market in Illinois.

48.     In order to successfully enter this new market of regulated gaming in Illinois, it was essential to present new products as early as possible in 2012, therefore it was crucial to GPS that game design be ready for testing by January 31, 2012 at the latest.

49.     Therefore, GPS's advertisement, promotion, and development of the market for the video game terminals was directed towards scheduled demonstrations, regional trade shows and other sales and marketing activity as early as possible since purchasers intended to submit orders in early 2012.

50.     Having six games complete would have been sufficient to begin showing the video games to potential customers and complete the process of obtaining an Illinois Gaming License.

### AMI Continues to Lure GPS With False Statements and Promises

51.     In June 2011, Maas specifically stated to Bailey that games were complete and were prepared for the Illinois market (pending integration of the interface protocol).

52.     During May and June 2011, Maas stated to Bailey that although the interface protocol had not been published, that the industry was aware which interface would be used, and that AMI would begin integrating this interface protocol with the games already designed and "on the shelf."

53.     GPS invested in the advertisement, promotion, and develop of the market for the video game terminals in reliance upon AMI's statements and Fricke's silence.

54.     By October 2011, the Illinois Gaming Board had begun processing and granting video game terminal manufacturer licenses.

55.     GPS could not be licensed by the Illinois Gaming Board before the Illinois Agreement was executed and the video game terminals were submitted to the game testing laboratory for approval, and repeatedly advised AMI of its concern over the risk of missing the Illinois market.

56.     GPS grew increasingly concerned over the fact that the Illinois Agreement had not been finalized and continued to voice its concerns to Fricke.

57.     Fricke told GPS that it needed to make concessions in favor of AMI so that the agreement could be finalized.

58.     After nearly one year of negotiations and months of product development, a final Illinois Agreement dated November 9, 2011, was executed between GPS and AMI (the "November Agreement").

59.     The November Agreement contains clauses favoring AMI.

60.     During a December 19, 2011 phone conference, although AMI was having some problem meeting the December 31, 2012 deadline set forth in the November Agreement, Maas acknowledged the necessity to deliver the video game terminals to the Independent Testing Laboratory so that the products could be available for early 2012 trade shows and sales and personally and explicitly guaranteed GPS that the initial six products would be delivered to the Independent Testing Laboratory by or before January 31, 2012.

61.     Based upon Maas' assurances, as well as the statements of other representatives and agents of AMI, after the execution of the November Agreement, an Amendment to the November Agreement was also executed ("December Amendment").

62.     The December Amendment required AMI to produce sample video game terminals, ready for testing by the Independent Testing Laboratory and presentation in the Illinois regulated gaming market, by January 31, 2012.

63.     GPS entered into the November Agreement, as modified by the December Amendment, in reliance on AMI's statements regarding the progress of the relevant games.

64.     After the November Agreement and December Amendment were signed, AMI continued to assure GPS that six of the games were or would be complete and ready to present to the Independent Testing Laboratory by January 31, 2012, and the remaining games were nearly complete and samples for these remaining games would be produced by May 31, 2012.

65.     In reliance on AMI's statements, GPS continued to expend money and time in advertising and promoting the video game terminals for the Illinois market.

### AMI's Fraud Is Revealed

66.     AMI ultimately missed the January 31, 2012 deadline to produce video game terminal samples for submittal to the Independent Testing Laboratory.

67.     During the first quarter of 2012, discussions between AMI and GPS revealed that the games were not complete, and the video game terminals could not be produced on a timetable which would permit GPS to present the video game terminals to purchasers at the start of this new market in regulated gaming in the State of Illinois.

### The Extent of GPS's Damages are Revealed

68.     Upon information and belief the market for new video game terminals in the State of Illinois is expected to be between 40,000 and 60,000 machines; these machines will be sold to purchasers for between $12,000.00 and $18,000.00.

69.     As of May 8, 2012, AMI had failed to produce finished video game terminals for inspection under the November Agreement and December Amendment.

70.     In fact, GPS even missed the key ICMOA Gaming Conference & Trade Show on April 4, 2012 and suffered severe damage to its reputation in the gaming market, due to its failure to produce the video game terminals.

71. The time for entry into the opening of the new regulated gaming market in the State of Illinois has passed and GPS has been severely damaged in the form of lost profits, money expended to advertise, promote, and develop AMI's video game terminals, and damage to GPS's reputation in the gaming industry which has destroyed GPS's ability to enter the video lottery terminal gaming market in Illinois.

## COUNT I

### FRAUDULENT MISREPRESENTATION AGAINST AMI

72. Plaintiff incorporates and adopts by reference each and every allegation set forth in Paragraphs 1 through 71 above as if fully set forth herein.

73. AMI, by and through its agents, as more fully set forth above, falsely stated to representatives of GPS that video game design was complete on many of the games GPS ordered and that additional games were very close to completion.

74. The agents for AMI, including its President and CEO, Maas, knew that AMI did not have the games completed or nearly completed.

75. AMI made these false statements to GPS with the intent of inducing GPS to rely on AMI to provide video game terminals for the Illinois regulated gaming market, including inducing GPS to sign the November Agreement and December Amendment.

76. GPS reasonably relied on AMI's statements, because AMI was in the position to know the number of games it had completed; AMI was an established business in the electronic entertainment market; and AMI had originally pursued this market for its own interest.

77. As a result of GPS's reliance on AMI's false statements GPS entered into the Letter of Intent, the November Agreement, and the December Amendment with AMI. Accordingly, GPS was substantially damaged in the following ways:

a. GPS expended large sums of money promoting, advertising, and developing the market for AMI's video game terminals, including the formation of GPS to pursue this market, totaling approximately $1 million, which will be proved specifically at trial;

b. GPS missed the opening of this new regulated gaming market for which GPS's market share was expected to exceed 20%, netting profits of over $20 million, which will be proved specifically at trial; and

c. GPS's name and reputation in the gaming industry was severely damaged by AMI's failure to deliver the video game terminals for inspection in a timely manner, which destroyed GPS's ability to enter the Illinois video lottery terminal gaming market and damaged GPS's ability to enter future gaming markets, in amounts over $5 million, which will be proved specifically at trial.

78. Because GPS was fraudulently induced to sign the November Agreement and the December Amendment with AMI, the Agreement and amendment are a nullity.

79. AMI's behavior was willful and outrageous, demonstrating an evil motive or reckless indifference to the rights of GPS, such that punitive damages should be awarded to GPS in this matter.

80. AMI's behavior in continuing the fraud against GPS is particularly malicious, in that AMI maintained the fraud well into 2012, despite the fact that AMI was nowhere near completion of the games in time to bring them to the Illinois regulated gaming market.

WHEREFORE, Plaintiff Galaxy Products & Services, Inc., prays that this Court enter judgment in its favor awarding GPS its actual damages fairly and reasonably believed to exceed the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, together

with pre and post-judgment interest, punitive damages, costs incurred herein, declaring the November Agreement and the December Amendment a nullity, and for such other and further relief which the Court deems necessary and just under the circumstances.

## COUNT II

### NEGLIGENT MISREPRESENTATION AGAINST AMI

81.     Plaintiff incorporates and adopts by reference each and every allegation set forth in Paragraphs 1 through 80 above as if fully set forth herein.

82.     AMI, by and through its agents, as more fully set forth above falsely stated to representatives of GPS that video game design was complete on many of the games GPS ordered and that additional games were very close to completion.

83.     In the alternative to Count I, the agents for AMI, including its President and CEO, Maas, stated that the games were complete or nearly complete, without knowledge whether the games were complete, or nearly complete.

84.     In the alternative to Count I, AMI's games were not completed or nearly completed when agents for AMI recklessly or negligently stated to GPS that the games were complete or nearly complete.

85.     AMI was under a duty to ascertain whether the games were complete or nearly complete before stating to GPS that the games were complete or nearly complete, due to the fact that only AMI would know if the games were complete or nearly complete and the fact that the short time frame for regulatory approval required that AMI be able to produce the video game terminals for inspection quickly.

86. AMI made these false statements to GPS to induce GPS to rely on AMI to produce video game terminals for the Illinois regulated gaming market, including inducing GPS to sign the November Agreement and December Amendment.

87. GPS reasonably relied on AMI's statements, because AMI was in the position to know the number of games it had completed; AMI was an established business in the electronic entertainment market; and AMI had originally pursued this market for its own interest.

88. As a result of GPS's reliance on AMI's false statements, GPS entered into the Letter of Intent, the November Agreement, and the December Amendment with AMI. Accordingly GPS was substantially damaged in the following ways:

    a. GPS expended large sums of money promoting, advertising, and developing the market for AMI's video game terminals, including the formation of GPS to pursue this market, totaling approximately $1 million, which will be proved specifically at trial;

    b. GPS missed the opening of this new regulated gaming market for which GPS's market share was expected to exceed 20%, netting profits of $20 million, which will be proved specifically at trial; and

    c. GPS's name and reputation in the gaming industry was severely damaged by AMI's failure to deliver the video game terminals for inspection in a timely manner, which destroyed GPS's ability to enter the Illinois video lottery terminal gaming market and damaged GPS's ability to enter future gaming markets, in amounts over $5 million, which will be proved specifically at trial.

89.     Because GPS was negligently or recklessly induced to sign the November Agreement and the December Amendment with AMI, the agreement and amendment are a nullity.

90.     AMI's behavior was outrageous, demonstrating reckless indifference to the rights of GPS, such that punitive damages should be awarded to GPS in this matter.

91.     AMI's behavior in continuing to negligently or recklessly misrepresent the status of the game design to GPS is particularly malicious, in that AMI maintained the misrepresentation well into 2012, despite the fact that AMI was nowhere near completion of the games in time to bring them to the Illinois regulated gaming market.

WHEREFORE, Plaintiff Galaxy Products & Services, Inc., prays that this Court enter judgment in its favor awarding GPS its actual damages fairly and reasonably believed to exceed the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, together with pre and post-judgment interest, punitive damages, costs incurred herein, declaring the November Agreement and the December Amendment a nullity, and for such other and further relief which the Court deems necessary and just under the circumstances.

## COUNT III

### BREACH OF FIDUCIARY DUTY AGAINST FRICKE

92.     Plaintiff incorporates and adopts by reference each and every allegation set forth in Paragraphs 1 through 91 above as if fully set forth herein.

93.     Fricke, at all relevant times, had a duty to exercise the utmost good faith, honesty, and fairness in his dealings with GPS.

94.     Fricke, as more fully set forth above, breached his duty to GPS in the following manner:

a. Undertaking to represent GPS in dealings with AMI, when Fricke was acting as agent and counsel for AMI.

b. Failing to fully advise GPS regarding the conflict of interest that existed between Fricke's representation of both GPS and AMI.

c. Advising GPS in preparation for and regarding Bailey's meeting with Bezzant, when Fricke was still representing AMI.

d. Failing to advise GPS to consult outside counsel before signing the Conflict of Interest Waiver.

e. Instructing GPS to sign the Conflict of Interest Waiver, knowing or having reason to know Bailey had not consulted outside counsel.

f. Consulting with AMI immediately before and after the May 14, 2010 meeting.

g. Failing to fully disclose to GPS the extent of his relationship with AMI, while continuing to represent AMI on other matters during the entirety of his representation of GPS in its business with AMI.

h. Assuring GPS, through Zimmerman, that there was no conflict of interest with AMI.

i. Allowing his interest in AMI to prevent him from acting as a zealous advocate during negotiations with AMI.

j. Failing to disclose to GPS, at any time, but in particular before GPS signed the November Agreement and the December Amendment, that the statements by AMI that the products were "on the shelf" and "completed" were inaccurate.

95. As a result of Fricke's breach of duty, GPS formed an attorney-client relationship with Fricke, and entered into the Letter of Intent, the November Agreement, and the December Amendment with AMI, accordingly GPS was substantially damaged in the following ways:

a. GPS paid substantial legal fees to Fricke, totaling over $50,000, which will be specifically proved at trial;

b. GPS expended large sums of money promoting, advertising, and developing the market for AMI's video game terminals, including the formation of GPS to pursue this market, totaling approximately $1 million, which will be proved specifically at trial;

c. GPS missed the opening of this new regulated gaming market for which GPS's market share was expected to exceed 20%, netting profits of $20 million, which will be proved specifically at trial; and

d. GPS's name and reputation in the gaming industry was severely damaged by AMI's failure to deliver the video game terminals for inspection in a timely manner, which destroyed GPS's ability to enter the Illinois video lottery terminal gaming market and damaged GPS's ability to enter future gaming markets, in amounts over $5 million, which will be proved specifically at trial.

WHEREFORE, Plaintiff Galaxy Products & Services, Inc., prays that this Court enter judgment in its favor awarding GPS its actual damages fairly and reasonably believed to exceed the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, together with pre and post-judgment interest, costs incurred herein, declaring the November Agreement and the December Amendment a nullity, and for such other and further relief which the Court deems necessary and just under the circumstances.

## COUNT IV

## NEGLIGENCE/ LEGAL MALPRACTICE AGAINST FRICKE

96.     Plaintiff incorporates and adopts by reference each and every allegation set forth in Paragraphs 1 through 95 above as if fully set forth herein.

97.     Fricke, as legal counsel for GPS, owed duties to GPS.

98.     Fricke breached his duties to GPS as fully set forth in paragraph 96, *supra*.

99.     As a result of Fricke's negligence, GPS formed an attorney-client relationship with Fricke, and entered into the Letter of Intent, the November Agreement, and the December Amendment with AMI, accordingly GPS was substantially damaged in the following ways:

   a.   GPS paid substantial legal fees to Fricke, totaling over $50,000, which will be specifically proved at trial;

   b.   GPS expended large sums of money promoting, advertising, and developing the market for AMI's video game terminals, including the formation of GPS to pursue this market, totaling approximately $1 million, which will be proved specifically at trial;

   c.   GPS missed the opening of this new regulated gaming market for which GPS's market share was expected to exceed 20%, netting profits of $20 million, which will be proved specifically at trial; and

   d.   GPS's name and reputation in the gaming industry was severely damaged by AMI's failure to deliver the video game terminals for inspection in a timely manner, which destroyed GPS's ability to enter the Illinois video lottery terminal gaming market and damaged GPS's ability to enter future gaming markets, in amounts over $5 million, which will be proved specifically at trial.

WHEREFORE, Plaintiff Galaxy Products & Services, Inc., prays that this Court enter judgment in its favor awarding GPS its actual damages fairly and reasonably believed to exceed the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, together with pre and post-judgment interest, costs incurred herein, declaring the November Agreement and the December Amendment a nullity, and for such other and further relief which the Court deems necessary and just under the circumstances.

**COUNT V**

**CONCERT OF ACTION AGAINST ALL DEFENDANTS**

100.    Plaintiff incorporates and adopts by reference each and every allegation set forth in Paragraphs 1 through 99 above as if fully set forth herein.

101.    AMI was aware that Fricke was acting as counsel for and had a duty to GPS.

102.    AMI, as more fully set forth above, substantially assisted or encouraged Fricke to breach his duty to GPS in the following manners:

    a.    On information and belief, encouraging Fricke, counsel for AMI, to enter into an attorney-client relationship with GPS.

    b.    Allowing Fricke to become counsel to GPS in the business relationship between AMI and GPS by signing the Conflict of Interest Waiver.

    c.    Failing to timely engage the services of Dickstein Shapiro after the Conflict of Interest Waiver was signed, and allowing Fricke to represent both AMI and GPS in negotiations from May to January 2010.

    d.    Continuing to discuss with Fricke information regarding the AMI-GPS relationship, outside the presence of and unknown to GPS.

    e.   Using the ongoing attorney-client relationship between AMI and Fricke, and the resulting bargaining power, to AMI's advantage in negotiations with Fricke on behalf of GPS, both directly with Fricke and through Grossman, so that the November Agreement and December Amendment contained provisions more favorable to AMI.

    103.   Fricke, in breaching his duty to GPS, gave substantial assistance to AMI in inducing GPS to enter into November Agreement and December Amendment in the following manners:

    a.   Undertaking to represent GPS in dealings with AMI, when Fricke was acting as agent and counsel for AMI.

    b.   Failing to fully advise GPS regarding the conflict of interest that existed between Fricke's representation of both GPS and AMI.

    c.   Advising GPS in preparation for and regarding Bailey's meeting with Bezzant, when Fricke was still representing AMI.

    d.   Failing to advise GPS to consult outside counsel before signing the Conflict of Interest Waiver.

    e.   Instructing GPS to sign the Conflict of Interest Waiver, knowing or having reason to know Bailey had not consulted outside counsel.

    f.   Allowing his interest in AMI to prevent him from acting as a zealous advocate during negotiations with AMI.

    g.   Failing to disclose to GPS the potential effect of provisions included in the November Agreement, including, but not limited to, the choice of law and forum selection clauses.

h.  Failing to disclose to GPS, at any time, but in particular before GPS signed the November Agreement and the December Amendment, that the statements by AMI that the products were "on the shelf" and "completed" were inaccurate.

104.   As a result of these concerted actions between AMI and Fricke, GPS entered into the Letter of Intent, the November Agreement, and the December Amendment with AMI, accordingly GPS was substantially damaged in the following ways:

a.  GPS expended large sums of money promoting, advertising, and developing the market for AMI's video game terminals, including the formation of GPS to pursue this market, totaling approximately $1 million, which will be proved specifically at trial;

b.  GPS missed the opening of this new regulated gaming market for which GPS's market share was expected to exceed 20%, netting profits of $20 million, which will be proved specifically at trial; and

c.  GPS's name and reputation in the gaming industry was severely damaged by AMI's failure to deliver the video game terminals for inspection in a timely manner, which destroyed GPS's ability to enter the Illinois video lottery terminal gaming market and damaged GPS's ability to enter future gaming markets, in amounts over $5 million, which will be proved specifically at trial.

105.   Because GPS was wrongfully induced to sign the November Agreement and the December Amendment with AMI, the Agreement and amendment are a nullity.

106.   AMI's behavior was outrageous, demonstrating reckless indifference to the rights of GPS, such that punitive damages should be awarded to GPS in this matter.

- 21 -

107.     AMI's behavior in continuing to fraudulently or negligently misrepresent the status of the game design to GPS is particularly malicious, in that AMI maintained the misrepresentation well into 2012, despite the fact that AMI was nowhere near completion of the games in time to bring them to the Illinois regulated gaming market.

WHEREFORE, Plaintiff Galaxy Products & Services, Inc., prays that this Court enter judgment in its favor awarding GPS its actual damages fairly and reasonably believed to exceed the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, together with pre and post-judgment interest, punitive damages, costs incurred herein, declaring the November Agreement and the December Amendment a nullity, and for such other and further relief which the Court deems necessary and just under the circumstances.

## COUNT VI

### DECLARATORY JUDGMENT

108.     Plaintiff incorporates and adopts by reference each and every allegation set forth in Paragraphs 1 through 107 above as if fully set forth herein.

109.     There is an actual controversy between GPS and AMI regarding the production of video game terminals pursuant to the November Agreement and the December Amendment.

110.     As set forth more completely above, GPS was fraudulently or negligently induced to sign the November Agreement and the December Amendment, based upon AMI's statements regarding the state of progress of the design and production of the video game terminals for the Illinois market.

111.     As a result of AMI's fraudulent or willful and wanton conduct, this Court has the authority to declare the November Agreement and the December Amendment a nullity.

112.    It would be unjust to force GPS to adhere to an agreement, and amendment thereto, which AMI fraudulently or negligently created and it would be a windfall to AMI to permit AMI to enforce the November Agreement and December Amendment.

WHEREFORE, Plaintiff Galaxy Products & Services, Inc., prays that this Court enter judgment in its favor declaring the November Agreement and the December Amendment a nullity, and for such other and further relief which the Court deems necessary and just under the circumstances.

## COUNT VII

## BREACH OF CONTRACT

113.    While Plaintiff incorporates and adopts by reference each and every allegation set forth in Paragraphs 1 through 112, it pleads this Count in the alternative.

114.    GPS and AMI entered into the November Agreement attached as Exhibit 1 hereto, and incorporated herein, and the December Amendment to the November Agreement attached hereto and incorporated herein as Exhibit 2.

115.    GPS performed all the material provisions required of it in the November Agreement, as amended.

116.    AMI breached the November Agreement, as amended, in that it did not deliver the items required by the November Agreement, as amended, thereby causing damage to GPS including those actual and consequential damages delineated above and to be proved at trial.

117.    AMI's behavior was outrageous, demonstrated reckless indifference to the rights of GPS, such that punitive damages should be awarded to GPS in this matter.

WHEREFORE, Plaintiff Galaxy Products and Services, Inc., prays that this Court enter judgment in its favor awarding GPS its actual and consequential damages fairly and reasonably

believed to exceed the sum of $75,000.00, exclusive of interest and cost, together with pre and post-judgment interest, punitive damages, its costs incurred herein and for such and other further relief which this Court deems necessary and just under the circumstances.

## COUNT VIII

### ALTERNATIVE DECLARATORY JUDGMENT CONCERNING DAMAGES

118.   While Plaintiff incorporates and adopts by reference each and every allegation set forth in Paragraphs 1 through 117, it pleads this Count in the alternative.

119.   There is an actual controversy between GPS and AMI regarding the enforcement of the November Agreement, as amended, and more specifically in regard to Paragraph 15 in the November Agreement concerning limitation of damages.

120.   To the extent this Court rules the November Agreement, as amended, was lawfully entered in to, a controversy exists as to whether the damage clause of the November Agreement is enforceable, since GPS was fraudulently or negligently induced to agree to Paragraph 15.3, was unduly influenced and/or not properly advised by its attorney, who had a conflict of interest, so that it is unfair to enforce the limitation of damage provision contained therein.

121.   It would be unjust to force GPS to adhere to Paragraph 15.3 of the November Agreement which is unconscionable and an unlawful penalty.

122.   As a result of Defendant's fraudulent, willful and wanton conduct, and the inappropriate language in the November Agreement, this Court has the authority to declare Paragraph 15.3 of the November Agreement unenforceable.

WHEREFORE, Plaintiff Galaxy Products and Services, Inc. prays that this Court enter judgment in its favor declaring Paragraph 15.3 of the November Agreement, as amended,

unconscionable, an unenforceable penalty, and a nullity and for such other and further relief

which the Court deems necessary and just under the circumstances.

LASHLY & BAER, P.C.

/s/ Mark H. Levison
Mark H. Levison
Admitted *pro hac vice*
714 Locust Street
St. Louis, Missouri 63101
Telephone: (314) 621-2939
Facsimile: (314) 621-6844
mlevison@lashlybaer.com

and

James R. Kahn
Margolis Edelstein
The Curtis Center
170 S. Independence Mall W Ste 400E
Philadelphia PA 19106-3337
215.931.5887 – telephone
215.922.1772 – facsimile
jkahn@margolisedelstein.com

ATTORNEYS FOR PLAINTIFF

## PROOF OF SERVICE

Signature above is also certification that on 1/30/13 , I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record for all parties.